**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CLIFTON CALDWELL, <br><br> Plaintiff, <br><br> v. <br><br> MASSACHUSETTS STATE POLICE OFFICERS TODD CAMBRA, NATALE LAPRIORE, LORI TRIPP, and UNKNOWN MASSACHUSETTS STATE POLICE OFFICERS; BROCKTON POLICE OFFICERS JENNIFER HAYES, EMANUEL GOMES, and UNKNOWN BROCKTON POLICE OFFICERS; the CITY OF BROCKTON, MASSACHUSETTS; ASSISTANT PLYMOUTH COUNTY DISTRICT ATTORNEY FRANK MIDDLETON; NORA BUCKLEY; and ROBIN ANAPOL, <br><br> Defendants. | No. 1:24-cv-12924-JEK |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

**KOBICK, J.**

Plaintiff Clifton Caldwell served over eighteen years in prison before his conviction for aggravated rape was vacated by the Massachusetts Supreme Judicial Court in May 2021. After the Commonwealth declined to pursue a retrial and dismissed the charge, Caldwell filed this civil action against those involved in the investigation and prosecution of his criminal case. He alleges that the defendants—the City of Brockton, officers with the Brockton Police Department, officers with the Massachusetts State Police, a prosecutor, a victim witness advocate, and an employee with the Massachusetts Department of Children and Families—violated his civil rights under federal and state law while investigating and securing his conviction. The defendants have

collectively filed four motions to dismiss his claims. For the reasons that follow, those motions will be granted in part and denied in part, such that most of his claims may proceed to discovery.

## BACKGROUND

The following facts, which are assumed true on a motion to dismiss, are drawn from the complaint, documents fairly incorporated by reference in that complaint, and documents subject to judicial notice. *See Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024).

In October 1999, Caldwell's twelve-year-old niece, S.J., alleged that her father—Caldwell's brother—had raped her eight years earlier, when she was four years old. ECF 1, ¶¶ 2, 26-27. S.J. also claimed that Caldwell and a third brother assisted her father in the assault. *Id.* ¶¶ 2, 26. She said she could identify Caldwell as one of her attackers by his laugh, but not by sight. *Id.* ¶ 4.

These allegations by S.J. came about because four of the defendants—Jennifer Hayes, a Brockton Police Officer; Frank Middleton, a Plymouth County Assistant District Attorney ("ADA"); Nora Buckley, a victim advocate employed by the Commonwealth; and Robin Anapol, an employee at the Massachusetts Department of Children and Families ("DCF")[1]—used suggestive interview techniques that caused S.J. to make up her claim of rape against her father and uncles. *Id.* ¶ 33. S.J. had not complained of an injury or reported the assault in 1991, when it had allegedly occurred, and there was no physical evidence, including trauma or bleeding, from that time or any time after. *Id.* ¶¶ 3, 28-29, 31. No medical provider ever opined that S.J. had experienced sexual assault, and S.J. had admitted to lying under oath when she had previously

---

[1] Anapol represents that she did not work at DCF, as Caldwell alleges, but was instead the Director of the Child Advocacy Center at the Plymouth County District Attorney's Office. ECF 49, at 4 n.3. The Court nevertheless takes as true, at this stage in the case, Caldwell's allegations regarding Anapol's employment. *See Maldonado v. Fontanes*, 568 F.3d 263, 266 (1st Cir. 2009).

alleged that her uncle, Caldwell's other brother, assaulted her on a separate occasion. *Id.* ¶¶ 30, 32. Nevertheless, the suggestive techniques used by Officer Hayes, ADA Middleton, Buckley, and Anapol induced the fabricated story of the rape. *Id.* ¶ 33.

At the time of S.J.'s claim, Caldwell was 42 years old and had difficulties communicating clearly. *Id.* ¶¶ 17, 38. The police arrested him in November 1999, the month after S.J.'s allegation. *Id.* ¶¶ 2, 48. He was jailed and placed in a cell with a man named George Thompson. *Id.* ¶¶ 37, 49. Unbeknownst to Caldwell, Thompson had a history of working with police officers to procure evidence of confessions against other criminal defendants in exchange for benefits. *Id.* ¶¶ 8-9, 41-42, 57-58. Defendant Todd Cambra, an officer with the Massachusetts State Police, had previously used Thompson to solicit a purported confession from a suspect. *Id.* ¶¶ 9, 41. Defendant Natale Lapriore, another officer with the Massachusetts State Police, likewise knew that Thompson was a long-time police informant. *Id.* ¶ 56. Lapriore had acted as a surety to Thompson in a prior criminal case as an incentive for Thompson to create evidence against other criminal defendants. *Id.* ¶ 57.

Three of the defendants—Cambra, Hayes, and Lori Tripp, another Massachusetts State Police officer—convinced Thompson to exploit Caldwell's communication difficulties and extract statements that Thompson could falsely claim to be a confession. *Id.* ¶¶ 37-38. Thompson complied with the officers' request and secured the fabricated confession from Caldwell during the time the two shared a cell, between November 24 and December 9, 1999. *Id.* ¶¶ 7, 37, 49-50. Buckley, the victim advocate, also put Thompson in touch with S.J.'s mother, who offered money to Thompson. *Id.* ¶ 44.

Caldwell was tried separately from his brothers on charges of aggravated rape. *Id.* ¶ 36. Based on the lack of physical and other incriminating evidence of the assault, Caldwell's brothers,

who were tried together, were acquitted of the charges. *Id.* ¶¶ 5, 36. Caldwell, however, was found guilty and sentenced to 27 to 35 years in prison. *Id.* ¶¶ 53-54. No forensic evidence was introduced against Caldwell at trial, and no physical evidence linked him to the alleged assault. *Id.* ¶¶ 51, 53. Instead, the prosecutors relied on testimony from S.J. and Thompson, some of which the defendants knew to be false. *Id.* ¶¶ 52, 81.[2] The fabricated testimony from Thompson about Caldwell's confession was the only difference between the evidence introduced in the two trials and, Caldwell alleges, made the difference between his conviction and his brothers' acquittals. *Id.* ¶¶ 6, 47.

The defendants and the prosecution team did not disclose to Caldwell that the testimony against him had been fabricated, nor did they disclose relevant impeachment evidence. *Id.* ¶¶ 39, 43, 80-82, 84. The police hid their relationship with Thompson from the prosecutors and from Caldwell's counsel. *Id.* ¶ 43. Cambra and Lapriore, in particular, suppressed Thompson's history of creating evidence for law enforcement officers in exchange for benefits. *Id.* ¶¶ 10, 55, 58. The government also failed to disclose to Caldwell that Buckley had put Thompson in touch with S.J.'s mother, who had offered Thompson money. *Id.* ¶¶ 44-45. As a result of this suppression, Caldwell was unable to pursue further discovery about the extent of Thompson's relationship with the police or raise it at trial. *Id.* ¶ 46. Anapol also withheld evidence that S.J. had made other allegations that Anapol knew to be false. *Id.* ¶ 35.

Caldwell maintained his innocence over the course of his incarceration. *Id.* ¶¶ 60, 64. Because he was convicted of a sex crime involving a child, he was subject to especial violence and harassment. *Id.* ¶¶ 61, 69. He was detained in maximum security prisons, where he was physically

---

[2] Caldwell alleges that Hayes, Middleton, Buckley, and Anapol also fabricated other evidence that was used in furtherance of his wrongful prosecution, but he does not identify the substance of this other evidence. ECF 1, ¶¶ 34, 85.

injured and assaulted. *Id.* ¶ 69. He suffered, among other injuries, multiple concussions from blows to his head, repeated beatings, and a broken hip. *Id.* ¶¶ 69, 73. These harms were exacerbated by his learning disability, hearing loss, and long-term disabilities. *Id.* ¶ 74.

On May 6, 2021, the Supreme Judicial Court vacated Caldwell's conviction and remanded for a new trial. *Id.* ¶¶ 11, 62; *see Commonwealth v. Caldwell*, 487 Mass. 370 (2021). The Court concluded that the Commonwealth's failure to disclose exculpatory evidence—namely, a note by the prosecutor concerning Thompson's testimony in a prior rape case about a jailhouse confession he had extracted—had prejudiced Caldwell's defense. *See Caldwell*, 487 Mass. at 375, 379. This note, the SJC explained, would have provided Caldwell with a powerful basis for impeaching Thompson's credibility. *Id.* at 377-78. On January 11, 2023, the Commonwealth dismissed all charges against Caldwell and entered a *nolle prosequi* "in the interest of justice," accompanied by S.J.'s affidavit explaining that she did not wish to proceed with another trial and testify again. ECF 1, ¶¶ 62, 108; ECF 49-3; ECF 49-4, ¶¶ 3, 6.

On November 22, 2024, Caldwell initiated this action, asserting nine federal and state law claims against the defendants: the City of Brockton; Brockton Police Officers Hayes and Emmanuel Gomes; Massachusetts State Police Officers Cambra, Lapriore, and Tripp; ADA Middleton; victim advocate Buckley; DCF employee Anapol; and unknown officers in the Massachusetts State Police and Brockton Police Department. ECF 1. The individual defendants are sued in their individual capacities. *Id.* ¶ 25. Caldwell's federal claims, brought pursuant to 42 U.S.C. § 1983, allege a violation of his right to due process guaranteed by the Fourteenth Amendment, in the form of deliberate fabrication of false evidence and withholding of exculpatory evidence (Count I); malicious prosecution, in violation of the Fourth and Fourteenth Amendments (Count II); conspiracy to deprive him of his constitutional rights (Count III); and failure to

intervene to prevent the violation of his constitutional rights (Count IV). *Id.* ¶¶ 78-122. Under state law, he asserts claims of intentional infliction of emotional distress (Count V); malicious prosecution (Count VI); negligence (Count VII); interference with his federal and state constitutional rights, in violation of the Massachusetts Civil Rights Act ("MCRA"), M.G.L. c. 12, §§ 11H, 11I (Count VIII); and civil conspiracy (Count IX). *Id.* ¶¶ 123-50.

All of the defendants except Lapriore moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The City of Brockton and Brockton Police Officers Hayes and Gomes filed one motion to dismiss, *see* ECF 23; Massachusetts State Police Officer Cambra filed another, *see* ECF 28; Massachusetts State Police Officer Tripp filed a third, *see* ECF 44; and ADA Middleton, victim advocate Buckley, and DCF employee Anapol filed a fourth, *see* ECF 48. The Court held a hearing after receiving Caldwell's opposition briefs. *See* ECF 35, 38, 45, 52, 54. At the hearing, Caldwell represented that he was abandoning his claims against Lapriore, who is now deceased. *See* ECF 54.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "'whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted.'" *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011)). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual

allegations." *Id.* at 679. The Court "may properly consider only facts and documents that are part of or incorporated into the complaint." *Rivera v. Centro Médico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (quotation marks omitted).

## DISCUSSION

### I.    Sufficiency of the Pleadings.

Before addressing the substance of Caldwell's claims, the defendants make a threshold argument for dismissal: they contend that his complaint fails to adequately distinguish each defendant's conduct and therefore does not satisfy the pleading requirements of Federal Rule of Civil Procedure 8. The grouped allegations in the complaint, they insist, impede their understanding of the claims against them and their ability to mount a meaningful defense.

On a motion to dismiss, the court must ascertain "whether, *as to each defendant*, a plaintiff's pleadings are sufficient to state a claim on which relief can be granted." *Sánchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009). Still, the analysis should be "context-specific," *Iqbal*, 556 U.S. at 679, and "[t]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible," *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011)). In some cases, "allegations that would individually lack the heft to make a claim plausible may suffice to state a claim in the context of the complaint's other factual allegations." *Ocasio-Hernández*, 640 F.3d at 15. And "'some latitude may be appropriate' in applying the plausibility standard" when "a material part of the information needed is likely to be within the defendant's control." *García-Catalán v. United States*, 734 F.3d 100, 104 (1st Cir. 2013) (quoting *Menard v. CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012)). For example, for some types of claims brought under Section 1983, the "precise knowledge of the chain of events leading to the constitutional

violation may often be unavailable to the plaintiff" at the motion to dismiss stage, such that courts should consult "judicial experience and common sense" in making a "contextual judgment about the sufficiency of the pleadings." *Ocasio-Hernández*, 640 F.3d at 16 (quotation marks omitted).

Looking to the "cumulative effect" of Caldwell's factual allegations, which concern events from over twenty years ago, the Court concludes that his complaint easily clears the specificity threshold required by Rule 8. *See id.* at 14. Many of the allegations in his complaint do specify the particular defendants who allegedly took actions that caused the deprivation of his rights under federal and state law. *See, e.g.*, ECF 1, ¶¶ 33-35, 37, 39, 41, 44, 50, 55-58, 91-93. For example, he alleges that Hayes, Middleton, Buckley, and Anapol caused S.J. to make up the rape allegation through their suggestive interview techniques, *id.* ¶ 33, and that Cambra, Tripp, and Hayes asked Thompson to secure a false confession from Caldwell, *id.* ¶¶ 37, 50. To be sure, other paragraphs in the complaint, including those pertaining to the causes of action, make allegations against the "Defendants" in general, rather than a particular defendant. *See, e.g.*, ¶¶ 79-88, 101-02, 104-05. But this does not warrant dismissal. As this Court observed in *Echavarria v. Roach*, which involved largely identical causes of action based on the plaintiff's wrongful conviction for murder, dismissal on this basis is particularly inappropriate where "much of the information [Caldwell] seeks is in the sole possession of [the] Defendants," and his "difficulty in acquiring the evidence necessary to prove his claims" is compounded by their alleged fabrication and concealment of evidence. No. 16-cv-11118-ADB, 2017 WL 3928270, at *4 (D. Mass. Sept. 7, 2017). The defendants here have adequate notice of Caldwell's claims and the alleged conduct that gives rise to those claims. *See id.*; *Carter v. Newland*, 441 F. Supp. 2d 208, 214 (D. Mass. 2006). That is enough. The Court will not dismiss Caldwell's complaint based on insufficiency of the pleadings.

## II.    <u>Absolute Immunity.</u>

One defendant, ADA Middleton, next contends that he has absolute prosecutorial immunity as to all of the claims asserted against him under Section 1983.[3] To determine whether a prosecutor may enjoy the protection of absolute immunity, courts apply a functional approach, assessing "the nature of the function performed," "not the identity of the actor who performed it" or "the particular act in isolation." *Penate v. Kaczmarek*, 928 F.3d 128, 135-36 (1st Cir. 2019) (quotation marks omitted). Absolute immunity is warranted when a prosecutor takes action to prepare for "the initiation of judicial proceedings or for trial" or to act "as an advocate for the State," *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), because broad protection for activities "intimately associated with the judicial phase of the criminal process" ensures the "vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal

---

[3] One heading in ADA Middleton's memorandum in support of the motion to dismiss contends that he "has absolute prosecutorial immunity for *all* claims raised in the complaint." ECF 49, at 12 (capitalization omitted and italics added). But the absolute immunity doctrine he invokes derives from the Supreme Court's interpretation of Section 1983, which incorporates certain "immunities 'well grounded in history and reason.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). And the substance of Middleton's absolute immunity argument relies only on cases addressing absolute immunity from federal claims brought pursuant to Section 1983, not state law claims. *See* ECF 49, at 12-15. Except with respect to Caldwell's common law malicious prosecution claim in Count VI, Middleton develops no argument that he is entitled to absolute immunity under Massachusetts law from the state law claims asserted in the complaint. While "the scope of prosecutorial immunity under State common law and [the MCRA] is at least as broad as under § 1983," *Chicopee Lions Club v. Dist. Atty. for Hampden Dist.*, 396 Mass. 244, 251 (1985), Massachusetts courts have also expressed that they are "quite sparing in [their] recognition of absolute immunity, . . . refus[ing] to extend it any further than its justification would warrant," *Cady v. Marcella*, 49 Mass. App. Ct. 334, 340 (2000) (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 n.4 (1993)). Under the circumstances, where Middleton makes no separate argument that he is entitled to absolute prosecutorial immunity under Massachusetts law for Counts V, VII, VIII, and IX of the complaint, the Court considers that argument forfeited. *See Chestnut v. City of Lowell*, 305 F.3d 18, 22 (1st Cir. 2002) (Torruella, J., concurring) ("Immunity, whether qualified or absolute, is an affirmative defense that can be forfeited, if not asserted in a timely manner, or waived." (citing *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996))).

justice system," *Imbler v. Pachtman*, 424 U.S. 409, 427-28, 430 (1976). But where prosecutors engage in "administrative" or "investigative" functions, as when they advise police officers during criminal investigations, or take actions, such as fabricating evidence, before there is probable cause for an arrest or before an indictment has been returned, only qualified immunity applies. *See Buckley*, 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."); *Penate*, 928 F.3d at 135-36. This is because "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Buckley*, 509 U.S. at 274 (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)). A government official seeking absolute immunity bears a "heavy" burden of showing that such immunity is appropriate. *Penate*, 928 F.3d at 135.

The complaint alleges that ADA Middleton "participated in the investigation stage" of Caldwell's criminal case, and it seeks to hold him responsible for "actions he undertook in conspiracy with the Police Officer Defendants in his investigatory capacity." ECF 1, ¶ 21. Specifically, the complaint alleges that Middleton, in concert with Hayes, Buckley, Anapol, and other unknown actors, used suggestive interview techniques that caused S.J. to fabricate her claim of a sexual assault, and then fabricated additional evidence in furtherance of Caldwell's prosecution. *Id.* ¶¶ 33-34. This conduct is not, as Middleton contends, actions "undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley*, 509 U.S. at 273. Rather, Middleton's conduct allegedly came early in the investigation, before anyone suspected Caldwell of criminal conduct, and it manufactured the probable cause to arrest Caldwell by inducing S.J.'s fabricated allegations. ECF 1, ¶ 33. Accepting these allegations as true, Middleton was acting in the role of

an investigator, not as an advocate, and he is not entitled to absolute immunity on Counts I through IV, all of which concern, at least in part, his actions taken in an investigatory capacity. *See Guzman-Rivera v. Rivera-Cruz*, 55 F.3d 26, 30 (1st Cir. 1995) (when prosecutors act to "uncover evidence in the first instance, . . . they are not performing a function 'intimately associated with the *judicial* phase of the criminal process'" (quoting *Imbler*, 424 U.S. at 430)).

Middleton is, however, entitled to absolute immunity with respect to Caldwell's claims that he improperly withheld exculpatory evidence. In *Reid v. State of New Hampshire*, the First Circuit concluded that "prosecutors retain discretion to determine what evidence is to be disclosed . . . and that absolute immunity attaches to their exercise of discretion." 56 F.3d 332, 336-37 (1st Cir. 1995) (emphasis omitted) ("[I]t is now [a] well-settled rule that a prosecutor cannot be held personally liable for the knowing suppression of exculpatory information." (quotation marks omitted)). The First Circuit accordingly found that absolute prosecutorial immunity applied to allegations that prosecutors "repeatedly misled the trial court in order to conceal their alleged misconduct" and "continued to withhold the exculpatory evidence long after [the petitioner's] conviction." *Id.* at 337-38. Middleton is likewise protected by absolute immunity insofar as the complaint accuses him of initiating the prosecution and presenting false testimony during trial. *See Diaz-Colon v. Fuentes-Agostini*, 786 F.3d 144, 151 (1st Cir. 2015) ("[p]rosecutors regularly prepare and present testimony by witnesses to whom the government has offered inducements to secure their cooperation," and "trial itself is the quintessential judicial proceeding").

### III.    <u>Qualified Immunity.</u>

Certain individual defendants—Brockton Police Officers Hayes and Gomes, ADA Middleton, victim advocate Buckley, and DCF worker Anapol—next argue that they are entitled to qualified immunity on the Section 1983 claims asserted in Counts I, II, III, and IV of the

complaint.[4] Qualified immunity shields government officials performing discretionary functions from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "seeks to balance two opposing interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 39 (1st Cir. 2024) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Because qualified immunity is an immunity from suit, an officer's claim of qualified immunity 'ought to be resolved as soon as possible in [the] litigation.'" *Brown v. Dickey*, 117 F.4th 1, 6 (1st Cir. 2024) (quoting *Norton v. Rodrigues*, 955 F.3d 176, 183 (1st Cir. 2020)).

"The qualified immunity inquiry proceeds with a now-familiar two-part test: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quotation marks omitted); *see Est. of Rahim*

---

[4] In moving to dismiss, Cambra and Tripp also assert, in a conclusory manner, that they are "entitled to qualified immunity as the Complaint provides insufficient facts to support Plaintiff's § 1983 claims for violations of his right to due process, malicious prosecution, conspiracy to deprive him of his constitutional rights, and failure to intervene." ECF 28, at 6-7; ECF 44, at 7. To support this assertion, they offer a single sentence of argument—namely, that "a § 1983 claim for malicious prosecution was not clearly established at the time of Plaintiff's arrest and conviction and claims for failure to intervene are typically confined to cases involving excessive force." ECF 28, at 7; ECF 44, at 7. This is not sufficient to preserve a qualified immunity defense. Cambra and Tripp offer no argument at all as to why they are entitled to qualified immunity on Caldwell's due process claim in Count I or his conspiracy claim in Count III. And their single-sentence argument with respect to Counts II and IV is devoid of any case citation or elaboration. Lacking any effort at developed argumentation, Cambra and Tripp's argument is not sufficient to raise and preserve a qualified immunity defense as to Counts I through IV of the complaint. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (issues are deemed waived where, as here, they are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation").

*by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) ("The prongs need not be addressed in order, and an officer may be entitled to immunity based on either prong."). The "clearly established" prong involves two sub-inquiries. The first "'focuses on the clarity of the law at the time of the violation.'" *Penate*, 944 F.3d at 366 (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013); *Berge*, 107 F.4th at 40 (courts may look to controlling and persuasive caselaw finding a violation under similar facts or providing a general standard that "appl[ies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful" (quotation marks omitted)). The second "'focuses more concretely on the facts of the particular case and whether a reasonable defendant would have known that his conduct violated the plaintiff's constitutional rights.'" *Penate*, 944 F.3d at 366 (quoting *Drumgold*, 707 F.3d at 42). "The salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009); *see Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017) (in determining whether "clearly established" prong is met, plaintiff need not "identify cases that address the 'particular factual scenario' that characterizes his case," so long as "existing precedents establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule").

    A.    <u>Due Process Claim.</u>

Count I of the complaint asserts that the defendants violated Caldwell's due process right to a fair trial by fabricating incriminating evidence, including S.J.'s allegation against Caldwell and Thompson's false report of Caldwell's confession, and withholding material evidence. Hayes, Gomes, Middleton, Buckley, and Anapol counter that they are entitled to qualified immunity on all of Caldwell's theories of liability. The Court will address each in turn.

      *1.  Fabrication of Evidence: S.J.'s Allegation and False Confession to Thompson.*

Hayes, Gomes, Middleton, Buckley, and Anapol first argue that they are entitled to qualified immunity because Caldwell's complaint does not allege a due process violation with respect to the purported fabrication of S.J.'s allegations. The "self-evident" truth that due process prohibits "those charged with upholding the law . . . from deliberately fabricating evidence and framing individuals for crimes they did not commit" is well established. *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004). While courts have also recognized that "[t]here is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner," Caldwell does not seek to vindicate a right to have had S.J. interviewed in a particular way. *Mondol v. City of Somerville*, No. 15-cv-13697-ADB, 2017 WL 4845019, at *11 (D. Mass. Oct. 26, 2017) (quotation marks omitted), *aff'd sub nom. Mondol v. City of Somerville*, 746 F. App'x 35 (1st Cir. 2018). Rather, he alleges that Hayes, Middleton, Buckley, Anapol, and other unknown actors "caused" S.J. to "make up an incriminating story against [Caldwell] and his brothers" through "suggestive" interview techniques. ECF 1, ¶ 33. This allegation—that these defendants fabricated S.J.'s claim to create evidence that was used to frame Caldwell for a crime he did not commit—is enough to state a constitutional violation. *See Limone*, 372 F.3d at 44-45. However, the complaint makes no allegations linking Gomes to the solicitation of S.J.'s allegation, so this due process theory with respect to Gomes must be dismissed.

Middleton, Buckley, and Anapol separately argue that this right was not clearly established at the time of the alleged violations. But "the right not to be framed by law enforcement agents was clearly established" by 1967. *See id.* at 45. Though "clearly established law must not be gauged at too high a level of generality," a "[g]eneral statemen[t] of the law [is] not inherently incapable of giving fair and clear warning to public officials." *Alfano*, 847 F.3d at 76 (quotation

marks omitted). By 1999, the "duty to refrain from procuring convictions by the presentation of testimony known to be perjurious" applied "broadly to the sovereign and its agents." *Limone*, 372 F.3d at 47. "[N]o reasonable official under similar circumstances would have thought it was constitutionally permissible" to fabricate evidence accusing a person of rape. *Guillemard-Ginorio v. Contreras-Gómez*, 585 F.3d 508, 529 (1st Cir. 2009) (quotation marks omitted). Accordingly, qualified immunity does not shield Hayes, Middleton, Buckley, or Anapol from Caldwell's claim that the fabrication of S.J.'s allegation violated his right to due process.

Middleton, Buckley, Anapol, Hayes, and Gomes also contend that they are entitled to qualified immunity because the complaint does not plausibly state a constitutional violation relating to the alleged solicitation of a false confession via Thompson. The complaint alleges that "police, including but not limited to Defendants Cambra, Tripp, and Hayes, fabricated a false 'confession'" by requesting that Thompson exploit Caldwell's communication difficulties and manipulate him into providing statements that could form the basis of the confession. ECF 1, ¶¶ 37-38, 49-50. It further alleges that Gomes, also a police officer, knew the confession was false but did not disclose to prosecutors that the confession testimony from Thompson had been fabricated. *Id.* ¶¶ 19, 39. Caldwell also alleges that Buckley put Thompson in contact with S.J.'s mother, who offered Thompson money. *Id.* ¶ 44. Taken as true, these allegations plausibly state a due process violation against the police officer defendants—Hayes, Gomes, Tripp, and Cambra—and Buckley for fabrication of evidence vital to Caldwell's conviction. *See Limone*, 372 F.3d at 44 (allegation that "appellants purposefully suborned false testimony from a key witness" states a due process violation). As this due process right was clearly established in 1999, at the time of the alleged fabrication, qualified immunity does not bar Caldwell's claim against them on this theory. *Id.* at 45, 47. Because these allegations are limited to the conduct of the police officers and Buckley,

however, the complaint does not state a plausible claim against ADA Middleton or Anapol related to the use of Thompson to fabricate a false confession. ECF 1, ¶¶ 37-59 (claiming that the "police . . . fabricated a false 'confession'").

Accordingly, Caldwell's due process claims against Middleton and Anapol survive insofar as they concern fabrication of S.J.'s allegations but must be dismissed insofar as they concern fabrication of a false confession through Thompson. Caldwell's due process claim against Gomes must be dismissed insofar as it concerns fabrication of S.J.'s allegations but survives insofar as it concerns fabrication of a false confession through Thompson. The due process claim pertaining to fabrication survives in full as to the remaining individual defendants.

### 2. *Withholding Evidence.*

Buckley, Anapol, Hayes, and Gomes next argue that they are entitled to qualified immunity on Caldwell's theory that his due process right to a fair trial was violated by the defendants' withholding or suppression of exculpatory evidence.[5] "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This principle is an "extension" of the Supreme Court's decisions in *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) and *Pyle v. Kansas*, 317 U.S. 213, 216 (1942), which held that the deliberate suppression of evidence favorable to the defendant violates due process. *See Brady*, 373 U.S. at 86; *Haley v. City of Boston*, 657 F.3d 39, 50 (1st Cir. 2011) ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."). The First Circuit has been "careful to distinguish between the proscription originating

---

[5] As discussed, ADA Middleton has absolute prosecutorial immunity from this claim.

in *Mooney* and *Pyle* against the deliberate suppression of evidence and the more recent affirmative disclosure obligation announced in *Brady*," which applies even absent bad faith. *Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013); *see Haley*, 657 F.3d at 46.

Here, Caldwell's allegations appear to implicate both theories of suppression. *See, e.g.*, ECF 1, ¶¶ 35, 39, 43, 45-46, 58-59, 80-81, 84-85, 87. With respect to his deliberate suppression theory, Caldwell alleges that the defendants "deliberately withheld exculpatory evidence from Caldwell and from state prosecutors, . . . thereby misleading and misdirecting the criminal prosecution." *Id.* ¶ 80. The complaint sets forth a litany of alleged disclosure violations, including that Gomes was aware of but did not disclose the false confession from Thompson, *id.* ¶ 39; that the police "hid" their relationship and contacts with Thompson from prosecutors and Caldwell, *id.* ¶¶ 41-46, 58-59; and that "Anapol and/or other unknown actors were aware of other allegations by S.J. that were known by her and/or them to be untrue but withheld this evidence from [Caldwell]," *id.* ¶ 35. Viewed in their totality, these allegations suffice to state a due process violation. *See Haley*, 657 F.3d at 49-51 (allegation that police officers deliberately withheld statements from witnesses given on the day of a murder, but which were inconsistent with trial testimony, stated a due process claim). The defendants do not dispute that the right against deliberate suppression of material evidence was clearly established at the time of the alleged violations. *See id.* at 50-51 (deliberate withholding of exculpatory statements by police was a clearly established violation of due process by 1972). Qualified immunity accordingly does not attach to this theory of liability.

With respect to his theory that the defendants violated their affirmative no-fault duty to turn over material evidence, Caldwell alleges, for example, that the extent of the defendants' contacts with Thompson were not disclosed to Caldwell. ECF 1, ¶ 45. The defendants do not,

however, meaningfully address this theory of suppression. Though Hayes and Gomes generally assert that Caldwell failed to state a violation of his right against the withholding of exculpatory evidence, the qualified immunity argument in their brief cites only the deliberate concealment standard set forth in *Haley* and does not address *Brady*'s no-fault disclosure obligation. ECF 24, at 9. And Buckley and Anapol merely state that it does not "make sense that individuals in [their] positions . . . have any role or duties in the production of evidence." ECF 49, at 6. Absent any "developed argumentation" as to why the defendants are entitled to qualified immunity on Caldwell's no-fault disclosure theory of a due process violation, the Court considers a qualified immunity defense with respect to this theory of liability forfeited. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).[6]

B.    Malicious Prosecution Claim Under the Fourth Amendment.

Count II asserts that the defendants initiated criminal proceedings against Caldwell to frame him for a crime they knew he did not commit, in violation of his rights under the Fourth and

---

[6] Contrary to Gomes' argument, *see* ECF 24, at 14, Caldwell has also stated a due process claim against him on a supervisor liability theory, and qualified immunity does not shield him from liability on that theory at this stage in the proceedings. Under Section 1983, while supervisors may not be held liable for the misconduct of their employees on a *respondeat superior* theory, they may be found liable for their own actions or omissions. *See Wadsworth v. Nguyen*, 129 F.4th 38, 62 (1st Cir. 2025); *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999) (describing when supervisory liability can attach). Caldwell alleges that the supervisor defendants, including Gomes, directly participated in the violation of his due process rights by signing incriminating reports and documents, even though the supervisors knew they contained false information. ECF 1, ¶ 82. Caldwell also claims that the supervisors in charge of his investigation, including Gomes, knew of the improper suppression of exculpatory evidence and fabricated evidence against him, but intentionally ignored and effectively acquiesced in this misconduct. *Id.* ¶¶ 39, 87. Finally, he alleges that the City supervisors caused his injuries by their deliberate indifference to adequate training, supervision, and discipline of officers regarding proper use of witness interviews, handling of exculpatory evidence, disclosure of exculpatory evidence, and use of informants. *Id.* ¶¶ 95-96. At this early stage in the case, these allegations plausibly state a due process claim on a supervisory liability theory against Gomes. Gomes makes no argument that Caldwell's due process rights were not clearly established at the time of his investigation and prosecution.

Fourteenth Amendments. Hayes and Gomes argue that Caldwell's malicious prosecution claim is barred by qualified immunity because Caldwell can neither show that his right against malicious prosecution was abridged nor that such a claim was clearly established by 1999, when the defendants first initiated their investigation.[7]

A claim for malicious prosecution protects individuals "targeted for unreasonable, baseless prosecutions, and who, as a result, are detained without probable cause during the pretrial period." *Hernandez-Cuevas*, 723 F.3d at 98. The First Circuit has recognized such a claim under the Fourth Amendment, but not the Fourteenth Amendment. *Id.* at 98-99; *see Nieves v. McSweeney*, 241 F.3d 46, 53-54 (1st Cir. 2001) (no procedural due process claim because Massachusetts law provides an adequate remedy, and no substantive due process claim, consistent with the Supreme Court's plurality opinion in *Albright v. Oliver*, 510 U.S. 266 (1994)). The plaintiff must establish that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas*, 723 F.3d at 101 (quotation marks omitted). Probable cause exists "when, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

The complaint alleges that Hayes, Middleton, Buckley, and Anapol manufactured probable cause to arrest Caldwell by using suggestive interview techniques that caused S.J. to make a false accusation against him. ECF 1, ¶¶ 33, 81. This alleged inducement of a false accusation formed

---

[7] Middleton, Buckley, and Anapol do not make any developed argument that they are entitled to qualified immunity on Count II. They have, accordingly, forfeited the argument. *See Zannino*, 895 F.2d at 17.

the basis for Caldwell's arrest and detention before his prosecution. ECF 1, ¶¶ 33, 48-49. No defendant contends that probable cause to arrest Caldwell on suspicion of aggravated rape would have existed absent S.J.'s allegations against him. As against these defendants, then, Caldwell's allegations are sufficient to plead the first two elements of a malicious prosecution claim under the Fourth Amendment, and his allegations support the plausible inference that any warrant to arrest Caldwell was not supported by facts believed by these defendants to be true. *See Hernandez-Cuevas*, 723 F.3d at 101-02. As against Gomes, however, the complaint lacks factual allegations linking him to the suggestive interview of S.J., so he is entitled to qualified immunity. The remaining individual defendants have not disputed, as to the Fourth Amendment malicious prosecution claim, that Caldwell plausibly alleges that the criminal proceedings terminated in his favor when his conviction was vacated and the charges against him were dismissed. *See Thompson v. Clark*, 596 U.S. 36, 39 (2022). Caldwell has therefore adequately pled a Fourth Amendment malicious prosecution claim against the remaining individual defendants.[8]

Whether Caldwell has satisfied the clearly established inquiry is a more difficult question. In 2001, the First Circuit held that "[i]t is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation," *Nieves*, 241 F.3d at 54, and this uncertainty persisted until the First Circuit's 2013 decision in *Hernandez-Cuevas*, 723 F.3d at 99-100. The defendants claim that as a result, the right against malicious prosecution was not "clearly established" in 1999, when the relevant events of this case took place. In Caldwell's view, the inquiry should be defined at a different level of abstraction—namely, whether the Fourth Amendment right not to be seized

---

[8] Because Cambra and Tripp make no developed argument that Caldwell has failed to plausibly allege the elements of a Fourth Amendment malicious prosecution claim against them, any such argument is forfeited.

without probable cause was clearly established by 1999. *See Manuel v. City of Joliet, Illinois*, 580 U.S. 357, 364-65 (2017) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

The focus of qualified immunity is on the officer's conduct, not the plaintiff's asserted cause of action. *See Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 54 n.8 (1st Cir. 2005). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). If "courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard." *Id.* at 202-203. The proper inquiry, then, is not whether the constitutional source of the right against malicious prosecution was clearly settled in 1999, but whether there was a clearly established right to be free from an arrest unsupported by probable cause due to government officials' fabrication of evidence. *See Hernandez-Cuevas*, 723 F.3d at 97 n.7 (in evaluating qualified immunity argument regarding malicious prosecution claim, noting that "the government's decision to forfeit the clearly established prong may have been motivated by the reasonable conclusion that such an argument would be hopeless in any event" because "[t]hough the question of whether the Fourth Amendment provides substantive protection during the pretrial period is a question of first impression in this circuit, it cannot be seriously argued that an objectively reasonable officer . . . would have been ignorant of the fact that fabricating evidence was constitutionally unacceptable"). The First Circuit has deemed it "self-evident" and "fundamental" that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Limone*, 372 F.3d at 44-45. Because the conduct underlying Caldwell's malicious

prosecution claim—that is, fabricating evidence to create probable cause to seize an innocent defendant—was clearly prohibited in 1999, Caldwell has satisfied the clearly established inquiry. Hayes is not, accordingly, entitled to qualified immunity on his malicious prosecution claim.

C.     Civil Rights Conspiracy Claim.

Count III asserts a Section 1983 claim based on the defendants' alleged conspiracy to deprive him of his constitutional rights. Hayes and Gomes argue that qualified immunity shields them from liability because Caldwell has failed to plausibly allege a conspiracy.[9] Tripp and Cambra separately assert that Caldwell has failed to state a civil rights conspiracy claim against them. The Court will address both contentions here.

A civil rights conspiracy claim under Section 1983 involves "'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020) (quoting *Est. of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008)). The plaintiff must show both a "conspiratorial agreement" and "an actual abridgment of some federally-secured right." *Nieves*, 241 F.3d at 53.

Count III alleges that the defendants, "acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame [Caldwell] for crimes that he did not commit, and thereby to deprive him of his constitutional rights," and intentionally committed overt acts in furtherance of the conspiracy. ECF 1, ¶¶ 111, 113; *see also id.* ¶¶ 79, 101. It also "incorporates each paragraph of [the] Complaint," including Caldwell's allegations that Hayes,

---

[9] Middleton, Buckley, and Anapol do not make any developed argument that they are entitled to qualified immunity on Count III. They have, accordingly, forfeited the argument. *See Zannino*, 895 F.2d at 17.

Middleton, Buckley, Anapol, and other unknown actors fabricated S.J.'s claim; that Cambra, Tripp, Hayes, Gomes, and other police officers fabricated and suppressed a false confession through Thompson; that Thompson had a longstanding relationship with the police in which he fabricated evidence against other defendants in exchange for benefits; and that the defendants deliberately suppressed exculpatory evidence to secure Caldwell's conviction. *Id.* ¶¶ 33, 37, 41-46, 56-58, 80, 84-86, 110.

At this stage, these allegations are enough to survive a motion to dismiss. Tripp and Cambra argue that the relationship between themselves and Thompson is not enough to infer the wide-ranging conspiratorial agreement alleged in the complaint, but the First Circuit has cautioned that "a plaintiff need not present direct evidence of the agreement." *Sánchez*, 972 F.3d at 12. Rather, because direct proof of an agreement is rarely available—particularly on a motion to dismiss— "more often than not[,] such an agreement must be inferred from all the circumstances." *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988); *see, e.g.*, *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) (district court erred in directing verdict on conspiracy claim because where plaintiff and other witnesses "testified to discussions between the officers," there was sufficient circumstantial evidence for a jury to find a conspiracy, should "the jury believ[e] that there was no probable cause for the arrest and that the officers' story was fabricated"). At this stage, the complaint, read as a whole, states a plausible claim of civil rights conspiracy against each of the individual defendants. And because they make no argument that this right was not clearly established in 1999, Hayes and Gomes are not entitled to qualified immunity.

D.    Failure to Intervene Claim.

Count IV asserts a Section 1983 claim based on the defendants' failure to intervene to prevent the violation of Caldwell's constitutional rights. Hayes, Gomes, Middleton, Buckley, and

Anapol argue that Caldwell's failure to intervene claim is barred by qualified immunity because a duty to intervene under the facts of this case—involving fabrication of evidence and withholding of exculpatory evidence—had not been clearly established by 1999. In Caldwell's view, because law enforcement officers have a duty to uphold the law, the clearly established inquiry is satisfied if the underlying constitutional right was clearly established at the time of the violation, and it is immaterial whether a separate duty to intervene to prevent a violation of that right was clearly established at the time.

The defendants have the better of the arguments. The First Circuit has explained that a duty to intervene "arises in a variety of factual circumstances and the phrase by itself cannot determine either whether a duty arises or how claims of violation of the duty are to be evaluated." *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51 (1st Cir. 2005) ("[e]ven when the claim is that a state actor . . . causes the injury, that alone does not tell us enough to make dispositive judgments," as "[t]here are a variety of state actors and a variety of settings within which they act"). To determine if a duty to intervene is clearly established in a particular context, the pertinent question is not whether a duty to intervene exists writ large, but instead whether the law would have put an officer in the defendant's circumstances on notice that he had a duty to intervene. *See id.* at 55. In 1999, when the alleged constitutional violations occurred, cases in the First Circuit addressing duty-to-intervene claims "primarily, if not exclusively, concerned allegations of failure to intervene in the excessive force context." *Echavarria*, 2017 WL 3928270, at *10 (citing cases). Caldwell does not point to any pre-1999 cases imposing on government officials a duty to intervene in circumstances involving another government actor's falsification or suppression of evidence. Because the clearly established inquiry is satisfied only if "controlling authority or a robust consensus of cases of persuasive authority" have "placed the constitutionality of the officer's conduct beyond debate,"

qualified immunity shields Hayes, Gomes, Middleton, Buckley, and Anapol from liability for failure to intervene. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation marks omitted); *see Weichel v. Town of Braintree*, No. 20-cv-11456-IT, 2021 WL 1948096, at *6 (D. Mass. May 14, 2021) (duty to intervene not clearly established outside excessive force context); *Cosenza v. City of Worcester*, 355 F. Supp. 3d 81, 101 (D. Mass. 2019) (same); *Echavarria*, 2017 WL 3928270, at *11 (same).

## IV.    <u>State Law Claims Against the Individual Defendants.</u>

The Court next addresses the individual defendants' arguments with respect to Counts V, VI, VII, and IX of the complaint, which assert claims arising under Massachusetts common law, and Count VIII, which asserts a violation of the MCRA, M.G.L. c. 12, §§ 11H, 11I.

### A.    <u>Intentional Infliction of Emotional Distress Claim.</u>

Count V asserts that the individual defendants intentionally inflicted emotional distress on Caldwell by fabricating evidence and withholding exculpatory evidence. Plaintiffs alleging intentional infliction of emotional distress must demonstrate "(1) that the actor intended to inflict emotional distress or that [she] knew or should have known that emotional distress was the likely result of [her] conduct . . .; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community . . . ; (3) that the actions of the defendant were the cause of the plaintiff's distress . . . ; and (4) that the emotional distress sustained by the plaintiff was severe." *Butcher v. Univ. of Massachusetts*, 483 Mass. 742, 758 (2019) (quotation marks omitted). "Liability cannot be predicated on mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal." *Polay v. McMahon*, 468 Mass. 379, 385 (2014) (quotation marks omitted).

Hayes, Gomes, Middleton, Buckley, and Anapol argue that Caldwell has not plausibly alleged that they engaged in the behavior underlying his claim—that is, the fabrication of evidence and withholding of exculpatory evidence. As with Caldwell's Section 1983 claims, however, his allegations are sufficiently detailed to survive a motion to dismiss. Caldwell alleges that, despite knowing he was innocent, the defendants initiated a case against him without probable cause, fabricated evidence of S.J.'s allegation and a false confession against him, and withheld exculpatory evidence in the course of securing his conviction for the aggravated rape of his niece. Caldwell was deprived of his liberty for over eighteen years before his conviction was vacated by the Supreme Judicial Court. During and after his incarceration, he experienced severe physical and mental health challenges. ECF 1, ¶¶ 63-77. Caldwell's allegations against the defendants, taken as true, describe the sort of extreme and outrageous conduct that can ground a plausible claim for intentional infliction of emotional distress, and his complaint adequately alleges that the defendants' conduct was the cause of his distress. *See Alexander v. United States*, 721 F.3d 418, 425 (7th Cir. 2013) (plaintiff alleging that law enforcement framed him stated a claim for intentional infliction of emotional distress); *Echavarria*, 2017 WL 3928270, at *12 (similar claims deemed sufficient to establish claim of intentional infliction of emotional distress).

B.    Malicious Prosecution Claim.

Count VI asserts a common law malicious prosecution claim. "The essence of the tort of malicious prosecution is 'interference with the right to be free from unjustifiable litigation.'" *Chervin v. Travelers Ins. Co.*, 448 Mass. 95, 102 (2006) (quoting *Foley v. Polaroid Corp.*, 381 Mass. 545, 552 (1980)). To allege malicious prosecution based on the unjustified initiation of criminal proceedings, a plaintiff must plead "(1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal

proceeding in favor of the plaintiff." *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 405 (2002) (quotation marks omitted). In this context, "malice" means that "'the proceedings must have been initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based.'" *Chervin*, 448 Mass. at 107 (quoting Restatement (Second) of Torts § 676 (1979)).

ADA Middleton first contends that, under Massachusetts law, he has absolute immunity from Caldwell's malicious prosecution claim. In support of this contention, he cites *Chicopee Lions Club v. District Attorney for the Hampden District*, which explained that under the absolute immunity doctrine applicable to Section 1983 claims, "a prosecutor is absolutely immune from a damage suit under § 1983 for actions taken in initiating and pursuing a criminal prosecution." 396 Mass. 244, 247 (1985) (citing *Imbler*, 424 U.S. 409). As previously explained, Middleton does not have absolute immunity on his Section 1983 claims—including the Fourth Amendment malicious prosecution claim—insofar as he acted in an investigative capacity to allegedly induce a false accusation from S.J. through suggestive interview techniques. Middleton does not contend that absolute immunity under state law is any broader than absolute immunity under Section 1983, so his argument for absolute immunity from the common law malicious prosecution likewise fails.

Further, the first element of a common law malicious prosecution claim—the institution of criminal process—can occur before the filing of the criminal complaint. *See Correllas v. Viveiros*, 410 Mass. 314, 318 (1991) ("It is well established that a person need not swear out a criminal complaint in order to be held answerable for malicious prosecution."). "In broad brush," the First Circuit has explained, "an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated." *Limone v. United States*, 579 F.3d 79, 89 (1st Cir. 2009); *see also Yacubian v. United States*, 750 F.3d 100, 109-10 (1st Cir. 2014) (allegations

in the complaint "must permit the 'reasonable inference'" that the defendant "in some sense caused the bringing of the" criminal charges (quoting *Iqbal*, 556 U.S. at 678)). The complaint plausibly alleges that, while acting in an investigative capacity, Middleton caused the aggravated rape charge against Caldwell to be instituted by inducing S.J. to fabricate allegations that Caldwell assisted his brother in raping her. *See* ECF 1, ¶ 33; *Limone*, 579 F.3d at 89 ("If an individual induces another person (say, a police officer or prosecutor) to lodge formal criminal charges, he may be held to have instituted the criminal proceedings."). Thus, the allegation that Middleton instituted criminal proceedings is not enough, at this stage, to entitle him to absolute prosecutorial immunity.

Anapol and Buckley next assert that Caldwell has not plausibly alleged that they, as a DCF employee and a victim advocate, respectively, were involved in instituting criminal proceedings against Caldwell. Again, a person has instituted criminal proceedings, for purposes of a malicious prosecution claim, if they "caused those proceedings to be initiated" by, for example, "induc[ing] another person . . . to lodge formal criminal charges," "exercis[ing] a peculiar degree of control over the charging official[,] or adamantly press[ing] that official to bring a criminal complaint." *Limone*, 579 F.3d at 89. A plaintiff may also treat all defendants who allegedly acted together to cause an injury as jointly liable. *See Santiago v. Fenton*, 891 F.2d 373, 387 (1st Cir. 1989). On the other hand, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution." *Correllas*, 410 Mass. at 318; *see Ziemba v. Fo'cs'le, Inc.*, 19 Mass. App. Ct. 484, 488 (1985). At bottom, "[t]he question of whether such an individual has instituted a criminal proceeding depends on the circumstances." *Limone*, 579 F.3d at 90. Here, the complaint asserts that Anapol and Buckley, together with Middleton and Hayes, fabricated S.J.'s testimony. ECF 1, ¶ 33. Though Caldwell does not suggest that Anapol

and Buckley hid that fact from prosecutors or adamantly pressed them to bring charges against him, he does contend that they fabricated the testimony jointly with a prosecutor and police officer. *See id.* This allegation—that they acted together—is therefore enough to open the door to discovery regarding Anapol's and Buckley's conduct on this charge.

For similar reasons, the Court rejects Hayes' and Gomes' contention that Caldwell failed to plausibly allege the first and second elements of his claim as against them. Caldwell alleges that Hayes, together with Middleton, Buckley, Anapol, and other unknown actors, fabricated S.J.'s allegation against him to create probable cause for his arrest. ECF 1, ¶ 33. Malice "may be inferred from a lack of probable cause." *Miller v. Pugliese*, 693 F. Supp. 3d 163, 182 (D. Mass. 2023). He also alleges that Hayes and Gomes were involved in securing and suppressing a confession, with Thompson's assistance, that they knew to be false. ECF 1, ¶¶ 37-39. Taken together, and viewing the complaint as a whole, these allegations are sufficient to plausibly allege the first and second elements of a malicious prosecution claim.

Finally, Middleton, Anapol, and Buckley argue that Caldwell cannot meet the third element because a *nolle prosequi* is considered a termination in favor of the plaintiff only when "the reasons stated for the nolle prosequi or dismissal [are] consistent with the innocence of the accused." *Wynne v. Rosen*, 391 Mass. 797, 800-01 (1984). "The circumstances of the abandonment must compel an inference that there existed a lack of reasonable grounds to pursue the prosecution." *Id.* at 801. Here, the *nolle prosequi* was entered "in the interest of justice." ECF 49-3. Accompanying the *nolle prosequi* was an affidavit that indicated two things: (1) S.J. did not wish to testify at a retrial, and (2) had S.J. been willing to testify, the prosecutor would have been willing to go ahead with the retrial, but acknowledged that retrial would be "very challenging." ECF 49-4, ¶¶ 5-6. It is plausible that these justifications for the *nolle prosequi* are consistent with Caldwell's innocence.

*See Finamore v. Miglionico*, 15 F.4th 52, 57, 61 (1st Cir. 2021) (plaintiff asserting malicious prosecution claim "plainly" established that the criminal proceedings terminated in his favor after the prosecutor dismissed one charge against him and *nolle prossed* the second charge, even though the "state district court made a finding of probable cause"); *cf. Thompson*, 596 U.S. at 45-46 (explaining that, under Massachusetts common law as of 1871, "a plaintiff could maintain a malicious prosecution claim when, for example, the prosecutor abandoned the criminal case or the court dismissed the case without providing a reason (citing *Bacon v. Waters*, 84 Mass. 400, 401-02 (1861), and *Sayles v. Briggs*, 45 Mass. 421, 425-26 (1842))). And accepting the allegations in the complaint as true, the broader circumstances of the *nolle prosequi* establish a plausible inference that no reasonable grounds existed for the prosecution and that the defendants acted with malice to manufacture probable cause. Caldwell alleges that the defendants instituted the prosecution against him for the improper purpose of framing him for a crime he did not commit, fabricated the evidence that formed the basis of the probable cause to arrest him, and solicited a false confession to secure his conviction. These allegations are sufficient to survive a motion to dismiss. *See Williams v. City of Boston*, 771 F. Supp. 2d 190, 206 (D. Mass. 2011) (denying motion to dismiss malicious prosecution claim where plaintiff alleged that "his conviction was obtained by the defendants' false testimony and as a result of a conspiracy between the defendants to deprive him of his constitutional rights").

      C.    <u>Negligence Claim.</u>

      Count VII alleges negligence, premised on the contention that the defendants violated two duties of care: "to refrain from framing [Caldwell] for a crime he had not committed and to conduct a legal and thorough investigation of the claimed assault." ECF 1, ¶ 139. At the hearing, Caldwell clarified that he is not pursuing negligence claims against Buckley, Anapol, or Middleton, but he

did not similarly abandon his negligence claims against Hayes, Gomes, Tripp, and Cambra. Those individual defendants argue, however, that his negligence claims are barred by the Massachusetts Tort Claims Act ("MTCA"), which provides that the exclusive remedy for injuries "caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment" shall be an action against the public employer. M.G.L. c. 258, § 2. Under the statute, public employers include "the commonwealth and any county, city, town, educational collaborative, or district," as well as "any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof." *Id.* § 1.

Cambra and Tripp were employees of the Massachusetts State Police, and Hayes and Gomes were employees of the Brockton Police Department, both of which are public employers under M.G.L. c. 258, § 1. Because Hayes, Gomes, Tripp, and Cambra's investigation of Caldwell was undertaken within the scope of their responsibilities as police officers, Caldwell's claim against them for negligence in conducting their investigation is barred by the MTCA and may only be asserted against their employers.

Caldwell protests that the MTCA's immunization of public employees is contingent on the employees' "reasonable cooperation [with] the public employer in the defense of any action brought under [the] chapter." *Id.* § 2. He argues that, at this stage, the extent of the officers' cooperation is not yet clear, so dismissal would be premature because "[f]ailure to provide such reasonable cooperation on the part of a public employee shall cause the public employee to be jointly liable with the public employer, to the extent that the failure to provide reasonable cooperation prejudiced the defense of the action." *Id.* This language, however, is "concerned with the relationship of the employer and the employee" and does not act "as a bar to dismissal of an action against an employee, subject, however, to the employer's rights against any employee who

does not reasonably cooperate." *Taplin v. Town of Chatham*, 390 Mass. 1, 2 n.2 (1983). Caldwell's negligence claim against the individual defendants is accordingly dismissed.

    D.    <u>MCRA Claim.</u>

Count VIII alleges that the defendants violated the MCRA by fabricating evidence of Caldwell's confession to Thompson. ECF 1, ¶ 144.[10] Under the MCRA, an injured person has a cause of action when another person, "whether or not acting under color of law," interferes or attempts to interfere "by threats, intimidation or coercion, with the exercise or enjoyment . . . of [their] rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth." M.G.L. c. 12, §§ 11H, 11I. While "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]," *Longval v. Comm'r of Corr.*, 404 Mass. 325, 333 (1989), if that action "also includes threats against, or intimidation or coercion of, a particular individual or individuals, liability under the MCRA can be established, and will be established if such threats, intimidation, or coercion interfered with that individual's exercise or enjoyment of rights secured by law," *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 473 (1994).

To plead an MCRA violation, a plaintiff must allege that "(1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion." *Barron v. Kolenda*, 491

---

[10] In his oppositions to the motions to dismiss, Caldwell appears to assert for the first time that the defendants' fabrication of S.J.'s allegation also violated the MCRA. *Compare* ECF 38, at 34; ECF 52, at 18, *with* ECF 1, ¶ 144 (arguing that the defendants interfered with Caldwell's exercise of his rights "by fabricating false 'confession' evidence against him"). But a plaintiff cannot amend his complaint by adding new allegations or theories in an opposition to a motion to dismiss. *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 7 n.2 (1st Cir. 2005). The Court accordingly considers only whether the defendants' fabrication of Caldwell's confession to Thompson amounted to a violation of the MCRA.

Mass. 408, 423 (2023) (quotation marks omitted); *Planned Parenthood*, 417 Mass. at 474 (whether conduct constituted threats, intimidation, or coercion is measured by an objective standard). A "threat" means "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Id.* at 474. "'Intimidation' involves putting [another] in fear for the purpose of compelling or deterring conduct." *Id.* "Coercion" means "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.* (quotation marks omitted). While "threats" and "intimidation" often involve "actual or threatened physical force," "coercion is a broader category that may rely on physical, moral, or economic coercion." *Kennie v. Nat. Res. Dep't of Dennis*, 451 Mass. 754, 763 (2008). "Threatening, intimidating, or coercive actions directed at third parties should be included in considering any conduct that forms the basis of a claim." *Haufler v. Zotos*, 446 Mass. 489, 503-04 (2006).

Hayes, Gomes, Middleton, Anapol, and Buckley contend that Caldwell does not plausibly allege that they violated his constitutional rights or engaged in conduct amounting to "threats, intimidation or coercion." The Court agrees that the complaint does not plausibly state an MCRA claim against Middleton and Anapol because all the allegations in the complaint pertaining to the false confession solicited through Thompson are limited to actions by Buckley and police officers in the Brockton Police Department and Massachusetts State Police. As to Hayes and Gomes, the complaint alleges that "police, including but not limited to Defendants Cambra, Tripp, and Hayes," were involved in "convinc[ing] Thompson to fabricate the 'confession'" and also "manipulat[ed] [Caldwell] into providing statements that Thompson could falsely claim to be a confession because [Caldwell] had difficulties in communicating clearly." ECF 1, ¶¶ 37-38. And as to Buckley, the complaint alleges that she connected Thompson with S.J.'s mother, who offered Thompson money.

*Id.* ¶ 44. These allegations plausibly allege that the police officer defendants and Buckley coerced Thompson and Caldwell to do something they "would not otherwise have done." *Planned Parenthood*, 417 Mass. at 474.

Furthermore, as discussed, Caldwell has plausibly alleged that this coercion led to the violation of his due process rights under the Fourteenth Amendment. "[P]urposefully suborn[ing] false testimony from a key witness" violates due process because "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." *Limone*, 372 F.3d at 44-45. Caldwell asserts that the police officer defendants "convinced Thompson to fabricate" a false confession and "fabricated evidence through [him] by manipulating [Caldwell] into providing statements that could form the basis of the confession because [Caldwell] had difficulties in communicating clearly." ECF 1, ¶¶ 37-38. He further contends that Buckley put Thompson in contact with S.J.'s mother, who offered Thompson money. *Id.* ¶ 44. Viewed in the light most favorable to Caldwell, these allegations plausibly establish a violation of Caldwell's right to due process. Caldwell's MCRA claim accordingly survives the defendants' motions to dismiss, though only as to Hayes, Gomes, Buckley, Cambra, and Tripp.

E.    Civil Conspiracy Claim.

Count IX asserts a civil conspiracy claim against the defendants. "Massachusetts law recognizes two distinct theories of liability under the umbrella term of civil conspiracy: concerted action conspiracy, and true conspiracy based on coconspirators exerting some peculiar power of coercion." *Greene v. Philip Morris USA Inc.*, 491 Mass. 866, 871 (2023) (citations and quotation marks omitted). To plead a true conspiracy, "a plaintiff must prove that alleged conspirators agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means, and then caused harm

to the plaintiff via some peculiar power of coercion that they would not have had, had they been acting independently." *Id.* at 875 n.10 (citations and quotation marks omitted). A concerted action conspiracy is "akin to a theory of common law joint liability in tort" and "applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." *Id.* at 871-72 (quotations marks omitted).

Count IX, which incorporates all paragraphs of the complaint, hews to the concerted action theory of civil conspiracy. ECF 1, ¶¶ 146-149. Caldwell asserts that the defendants, "acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame [Caldwell] for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means," agreeing to "protect one another from liability for depriving [him] of these rights." *Id.* ¶ 147. He also claims that the defendants intentionally "committed overt acts and were otherwise willful participants in joint activity" to further the conspiracy. *Id.* ¶¶ 148-49. For the same reasons that Caldwell's Section 1983 conspiracy claim in Count III survives the individual defendants' motions to dismiss, his common law conspiracy claim likewise may proceed to discovery.

## V.    Claims Against the City of Brockton.

The Court next addresses Caldwell's claims against the City of Brockton.

### A.    Municipal Liability Under Section 1983 (Counts I through IV).

Counts I through IV assert Section 1983 claims against the City. Under Section 1983, a municipality's liability cannot be premised on the unconstitutional actions of the municipality's non-policymaking employees but instead must be based on the municipality's own illegal actions. *Cosenza v. City of Worcester*, 120 F.4th 30, 38 (1st Cir. 2024). A plaintiff must allege that the

municipality, "through its *deliberate* conduct, . . . was the 'moving force' behind the injury alleged," *Bd. of Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997), and that the illegal action was taken "pursuant to official municipal policy of some nature," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). "[O]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). It may also encompass a municipality's failure to train its employees, though only under limited circumstances. *Id.*

To establish a *Monell* claim, a plaintiff must demonstrate that there was "a direct causal link between the municipal action and the deprivation of federal rights," and "that the municipal action was taken with the requisite degree of culpability." *Brown*, 520 U.S. at 404; *see Haley*, 657 F.3d at 51 (liability arises "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation" (quotation marks omitted)). Plaintiffs alleging that "a particular municipal action *itself* violates federal law, or directs an employee to do so," need show only that the "municipality's legislative body or authorized decisionmaker . . . intentionally deprived [them] of a federally protected right" to establish the requisite level of culpability. *Brown*, 520 U.S. at 404-05. Plaintiffs asserting a claim based on a failure to train theory must demonstrate that "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effect of those inadequacies." *Wadsworth v. Nguyen*, 129 F.4th 38, 68 (1st Cir. 2025) (quotation marks omitted). "Deliberate indifference requires a showing that [the City] disregarded a known or obvious risk of serious harm following from its failure to develop an adequate training program." *Id.* Such knowledge may be imputed "through a pattern of prior constitutional violations" or, rarely,

without such a pattern when the violation is a "highly predictable consequence of a failure to equip [government actors] with specific tools to handle recurring situations." *Id.* (quotation marks omitted).

Caldwell's allegations invoke several theories of Section 1983 liability against the City. He alleges (1) that the Brockton Police Department maintained an unwritten policy of not investigating or disclosing exculpatory evidence to criminal defendants, fabricating false evidence and witness testimony, and pursuing wrongful prosecutions and convictions, ECF 1, ¶¶ 91, 96, 109, 116, 122; (2) that final decisionmakers for the City were deliberately indifferent to these policies, and either knew and approved of or directly committed the constitutional violations that he suffered, *id.* ¶¶ 97-98, 109, 116, 122; (3) that the City failed to supervise and train its police officers regarding the proper use of witness interviews, the proper handling of exculpatory evidence, the government's disclosure obligations to criminal defendants, and the use of informants, even though violations of these responsibilities were "widespread" and "so well-settled as to constitute the de facto policy of the City," *id.* ¶¶ 95-96, 109, 116, 122; and (4) that the City failed to institute policies to prevent the false introduction of evidence into investigations, and instead promulgated "deficient rules, regulations, policies, and/or procedures governing witness interviews, the use of incentives to fabricate witness testimony, the preservation and disclosure of investigative materials and evidence, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of" City employees, *id.* ¶¶ 91-92. All of these practices and policies, he contends, were the "moving force" behind the constitutional violations he plausibly alleged against the individual defendants. *Id.* ¶¶ 91, 96; *see Wadsworth*, 129 F.4th at 66 (underlying constitutional violation necessary to establish municipal liability claim).

These allegations are sufficient to survive a motion to dismiss. The First Circuit's decision in *Haley v. City of Boston* is instructive. There, the complaint alleged that the Boston Police Department had a standing policy, "under which Boston police officers regularly kept helpful evidence from criminal defendants," and that the policy "was designed to encourage successful prosecutorial outcomes despite the existence of evidence pointing to innocence." 657 F.3d at 52. It also asserted, in the alternative, a failure to train theory, arguing that the Boston Police Department unconstitutionally suppressed exculpatory evidence as a result of insufficient training, "despite notice of persistent and ongoing violations." *Id.* at 51. Explaining that "this is neither the time nor the place to resolve the factual disputes between the parties," the First Circuit concluded that these allegations, though "couched in general terms," contained sufficient factual detail to proceed to discovery. *Id.* at 52-53; *see also Echavarria*, 2017 WL 3928270, at *5; *Cosenza*, 355 F. Supp. 3d at 92.[11] "Disclosure abuses are a recurring problem in criminal cases," the Court observed, and the violation alleged was "wholly unexplained" and pertained to evidence that "clearly would have undermined the prosecution's theory of the case." *Haley*, 657 F.3d at 53.

The City of Brockton protests that the complaint does not identify specific faults with its programs and training or plausibly plead deliberate indifference. The Court disagrees. The level of

---

[11] In *Wadsworth*, the First Circuit "assume[d] without deciding that [the insufficient policy theory was] a viable theory of liability." 129 F.4th at 66. Caldwell points out, however, that the Supreme Court has noted that a municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick*, 563 U.S. at 61-62 (quotation marks omitted); *see Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) ("The key is whether there is a conscious decision not to take action. . . . A single memo or decision showing that the choice not to act is deliberate could . . . be enough."). Caldwell adequately pleads that the City's failure to institute policies represented a "deliberate choice to follow a course of action . . . from among various alternatives" by alleging that there was "an obvious need for these policies" and the illegal activities were "widespread." *Connick*, 563 U.S at 62 (quotation marks omitted); *see* ECF 1, ¶¶ 91, 96.

detail in Caldwell's allegations mirrors that found adequate in *Haley*. Moreover, as this opinion has detailed, there is ample caselaw regarding fabrication of evidence and deliberate suppression of evidence. "Given th[is] volume of cases," as well as the violations Caldwell alleges, which were "wholly unexplained" and central to the "prosecution's theory of the case," Caldwell has laid a sufficient factual foundation to support his municipal liability claims. *Id.* If the City's police officers intentionally committed the alleged violations "even when such activity was condemned by the courts . . . , it seems entirely plausible that their conduct was encouraged, or at least tolerated," by the City. *Id.*

The City also argues that Caldwell has not identified facts to suggest that its alleged policies proximately caused the constitutional violations he suffered. For claims that a municipality itself violated federal law or directed such a violation, "causation is straightforward": "the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Brown*, 520 U.S. at 405. Caldwell claims that the City had a policy that encouraged its police officers to not properly investigate cases, to hide exculpatory evidence from criminal defendants, to fabricate false evidence, and to pursue wrongful prosecutions. ECF 1, ¶¶ 91, 96, 109, 116, 122. He also alleges that the City's final decisionmakers were deliberately indifferent to these policies, and either knew and approved of or directly committed the constitutional violations that he suffered. *Id.* ¶¶ 97-98, 109, 116, 122. Viewed in the light most favorable to Caldwell, these allegations plausibly establish that the City's policies and decisionmakers directed and therefore caused the constitutional violations that Caldwell has asserted.

For failure to train claims, the causation element is satisfied if "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989) (explaining that a more lenient standard "would result in *de facto respondeat superior* liability on municipalities" and "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs"). "[T]he identified deficiency in [the] city's training program must be closely related to the ultimate injury." *Id.* at 391. Here, the inadequacies in the City's training that Caldwell pinpoints—that is, failure to supervise and train officers in the proper use of witness interviews, the proper handling of exculpatory evidence, the disclosure obligations to criminal defendants, and the use of informants—are closely related to the constitutional harms he asserts.

Finally, insufficient policy claims, like failure to train claims, are "predicated upon a failure to act." *City of Canton*, 489 U.S. at 394-95 (O'Connor, J., concurring in part and dissenting in part) (characterizing failure to train theory). The Court accordingly adopts the same causation standard applied to failure to train claims. Caldwell argues that the City should have instituted policies to prevent the false introduction of evidence into investigations, and that its rules regarding witness interviews, incentives to fabricate testimony, preservation and disclosure of evidence, in-court testimony, and witness testimony were deficient. These missing policies, like the deficiencies in training, are directly relevant to the constitutional harms he alleges. Accordingly, the complaint contains sufficient factual content to allege proximate causation between the City's official actions and Caldwell's injuries.

B.      Intentional Tort Claims.

The City next argues—and Caldwell does not contest—that Caldwell's intentional tort claims in Counts V, VI, and IX are barred by the MTCA. The MTCA selectively abrogates the

Commonwealth's sovereign immunity, creating a cause of action against public employers for their employees' negligent or wrongful acts and omissions within the scope of their employment. *Nelson v. Salem State College*, 446 Mass. 525, 537 (2006). This waiver of immunity does not apply, however, to "any claim arising out of an intentional tort, including . . . intentional mental distress [and] malicious prosecution." M.G.L. c. 258 § 10(c). Based on the text of the MTCA and Massachusetts caselaw categorizing conspiracy as an intentional tort where, as here, the conspiracy arises out of intentionally tortious behavior, the Court concludes that Caldwell's claims for malicious prosecution, intentional infliction of emotional distress, and civil conspiracy against the City must be dismissed. *See Shaoguang Li v. Off. of Transcription Servs.*, No. 16-P-152, 2016 WL 6609796, at *1 (Mass. App. Ct. Nov. 8, 2016) (conspiracy is an intentional tort); *Cruthird v. Keefe Commissary Network*, No. 13-P-1287, 2014 WL 1325657, at *1 & n.5 (Mass. App. Ct. Apr. 4, 2014) (civil conspiracy claim based on intentionally tortious conduct qualified as an intentional tort under Section 10(c)).

    C.    <u>Negligence Claim.</u>

The City contends that Caldwell's negligence claim in Count VII was not timely presented, as required by the MTCA, M.G.L. c. 258 § 4, or, in any event, fails to state a plausible claim for relief. The Court will address the latter contention first, as it is dispositive. Caldwell asserts two duties underpinning his negligence claim—"to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation of the claimed assault." ECF 1, ¶ 139. The City argues, and the Court agrees, that to the extent Caldwell asserts a negligence claim based on the "duty to refrain from framing him," that claim is more appropriately characterized as an intentional tort claim and is thus barred by the MTCA. *See* M.G.L. c. 258 § 10(c) (sovereign immunity not waived for intentional torts by employees of public employers); ECF 1, ¶ 139. As

this Court has concluded, such a claim is "essentially a claim that the officers involved in the investigation intentionally framed [Caldwell], which led to his improper arrest and prosecution." *Echavarria v. Roach*, 565 F. Supp. 3d 51, 98 (D. Mass. 2021).

To the extent Caldwell bases his negligence claim on a theory of negligent investigation, that claim must fail as well. To establish a claim for negligence in Massachusetts, a plaintiff must allege that "a defendant owes a duty of reasonable care to the plaintiff, the defendant committed a breach of that duty, the plaintiff suffered damage, and a causal relationship existed between the breach of duty and the damage." *Hill-Junious v. UTP Realty, LLC*, 492 Mass. 667, 672-73 (2023) (quotation marks omitted). For a negligent investigation claim, "[a]n investigator's duty runs to the person or entity on whose behalf the investigation is conducted, not to the person being investigated." *O'Connell v. Bank of Boston*, 37 Mass. App. Ct. 416, 419 (1994) ("A slipshod or incomplete investigation, without more, is a disservice to the one who commissioned the investigation, not to its subject."). Once the investigation leads to "ill-founded allegations or charges of criminal conduct," the injured subject may bring claims of defamation, malicious prosecution, or tortious infliction of emotional distress, "but negligence alone does not make his or her accuser liable." *Id.* at 419-20 (dismissing negligent investigation claim because it "added nothing to the count for malicious prosecution"). Here, the City did not owe a duty of care to Caldwell, "the person being investigated," and he has already asserted a malicious prosecution claim to redress the injury he suffered as result of the investigation and ensuing criminal charges. *Cf. Echavarria*, 565 F. Supp. 3d at 97. His negligence claim must therefore be dismissed.

D.   <u>MCRA Claim.</u>

Finally, Caldwell conceded at the hearing that his MCRA claim in Count VIII does not extend to the City. *See Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 591-93 (2001)

(distinguishing definition of "person" in Section 1983 claims from that in MCRA claims and noting that "there is no indication in the MCRA that the word 'person' includes either the Commonwealth or any of its political subdivisions"); M.G.L. c. 4, § 7 ("'Person' or 'whoever' shall include corporations, societies, associations and partnerships."). Caldwell's MCRA claim against the City is therefore dismissed.

### CONCLUSIONS AND ORDERS

For the foregoing reasons, the defendants' motions to dismiss, ECF 23, 28, 44, 48, are GRANTED in part and DENIED in part, as follows:

With respect to <u>defendant City of Brockton</u>, Counts V, VI, VII, VIII, IX are DISMISSED, and Counts I, II, III and IV remain.

With respect to <u>defendant Jennifer Hayes</u>, Counts IV and VII are DISMISSED, and Counts I, II, III, V, VI, VIII, and IX remain.

With respect to <u>defendant Emanuel Gomes</u>, Counts II, IV, and VII are DISMISSED; Counts III, V, VI, VIII, and IX remain; and Count I is DISMISSED insofar as it concerns fabrication of S.J.'s accusation but otherwise remains.

With respect to <u>defendant Frank Middleton</u>, Counts IV, VII, and VIII are DISMISSED; Counts II, III, V, VI, and IX remain; and Count I is DISMISSED insofar as it concerns fabrication of false confession evidence through Thompson and withholding of evidence, but otherwise remains.

With respect to <u>defendant Robin Anapol</u>, Counts IV, VII, and VIII are DISMISSED; Counts II, III, V, VI, and IX remain; and Count I is DISMISSED insofar as it concerns fabrication of false confession evidence through Thompson but otherwise remains.

With respect to <u>defendant Nora Buckley</u>, Counts IV and VII are DISMISSED, and Counts I, II, III, V, VI, VIII, and IX remain.

With respect to <u>defendant Todd Cambra</u>, Count VII is DISMISSED, and Counts I, II, III, IV, V, VI, VIII, and IX remain.

With respect to <u>defendant Lori Tripp</u>, Count VII is DISMISSED, and Counts I, II, III, IV, V, VI, VIII, and IX remain.

And with respect to <u>defendant Natale Lapriore</u>, all Counts are DISMISSED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 10, 2025